UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
CHARLES G. GITTENS,

                        Plaintiff,                    **DECISION AND ORDER**

      -against-

                                                     07 Civ. 1397 (GAY)

MICHAEL J. ASTRUE, Commissioner
of Social Security,

                        Defendant.
--------------------------------------------------------X

Plaintiff Charles Gittens commenced this action pursuant to 42 U.S.C. § 405(g), challenging the decision by the Commissioner of Social Security ("the Commissioner") to deny plaintiffs application for disability insurance benefits on the ground that plaintiff was not disabled. Presently before this Court are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons that follow, I respectfully recommend that the case should be remanded to the Commissioner for further findings.

**I. BACKGROUND**

Plaintiff is a fifty three year-old male (born in 1954) who alleges that he is disabled due to chronic Hepatitis C, glaucoma, and chronic obstructive pulmonary disease ("COPD"). Mr. Gittens worked as a New York City police officer for twenty years. He tested positive for Hepatitis C during a routine physical examination. Mr. Gittens filed an application for a period of disability and disability insurance benefits on January 7, 2004, alleging an inability to perform any substantial gainful activity due to

Chronic Hepatitis C, Glaucoma and COPD.  His application was initially denied on June 1, 2004, based on the finding that he could perform sedentary work that required only lifting a maximum of ten pounds, and that he could walk and stand occasionally.  Mr. Gittens timely requested a hearing on July 21, 2004.  The hearing was held before Administrative Law Judge ("ALJ") Brian W. Lemoine on March 14, 2006.  On March 31, 2006, the ALJ issued a decision finding that the claimant retained the capacity to perform sedentary work within the meaning of 20 CFR § 416.967(a) and therefore was not disabled within the meaning of the Social Security Act.

Plaintiff then filed a request for review of a hearing decision, which was denied by the Appeals Council.  This denial rendered ALJ Lemoine's decision the final decision of the Commissioner, subject to judicial review.

## II.  STANDARD OF REVIEW

The Commissioner's factual findings are conclusive if they are supported by substantial evidence.  See 42 U.S.C. § 405(g).  Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotation and citation omitted).  "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quotation and citation omitted).  The reviewing court "may only set aside a determination which is based upon legal error or not supported by substantial evidence."  Yancey v. Apfel, 145 F.3d 106,

111 (2d Cir. 1998) (quotation and citation omitted).

### III. STATUTORY DISABILITY

The SSA defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). In addition, a person is eligible for disability benefits under the SSA only if

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). The Second Circuit has adopted a five-step analysis for evaluating disability claims under the SSA:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is

other work which the claimant could perform.

Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999). In determining whether there is other work which the claimant could perform, "the Commissioner must consider four factors: (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation and citation omitted).

## IV. ALJ'S DETERMINATION

Here, the ALJ applied the five-step procedure and concluded that plaintiff was not disabled within the meaning of the Act. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date of March 31, 2003. At step two, the ALJ determined that plaintiff suffered from COPD and Hepatitis C, both of which are "severe." At step three, the ALJ concluded that plaintiff did not have an impairment or combination of impairments listed in 20 C.F.R. Part 404, Appendix 1, Subpart P.

At step four, the ALJ found that plaintiff had the "residual functional capacity for a broad range of sedentary work, e.g., lifting/ carrying up to 10 pounds; sitting for 6 hours; standing and/or walking for two hours, with additional environmental restrictions that preclude him from no more than occasional exposure to dust, fumes, gases, and other airborne irritants. . . ." He also found that Mr. Gittens could not return to his past relevant work as a police officer.

In reaching this conclusion, the ALJ considered the records of Dr. Lane Segal,

4

who examined the plaintiff in November 2002, February 2003, March 4, 2003, and September 16, 2003. During the course of Dr. Segal's treatment, plaintiff was feeling "fairly well" and complained only of fatigue. A liver biopsy during this time showed mild portal inflamation but no necrosis or fibrosis. The ALJ also considered records from the VA hospital where Mr. Gittens was referred for possible antiviral therapy in November 2003. These records show plaintiff complained of occasional fatigue on exertion but no nausea, shortness of breath, abdominal pain, or other symptoms. The ALJ also considered the diagnosis of Dr. Hillel Tobias who examined the plaintiff in April of 2004. During his examination, Dr. Tobias noted complaints of severe malaise, fatigue, myalgias, arthralgias, increased irritability and inability to concentrate. Based on the plaintiff's symptoms and his diagnosis, it was Dr. Tobias' opinion that plaintiff was totally disabled. Also considered were the medical records and diagnosis of treating physician Dr. Peter Bezdicek, who examined plaintiff on four separate occasions between April 13, 2004 and May 25, 2005. During this time, Dr. Bezdicek diagnosed plaintiff with severe COPD and mild restrictive lung disease. Plaintiff denied any chest pain, fever, night sweats, chills, abdominal pain, nausea, dysuria, or hematuria. Plaintiff also denied any headaches, dizziness, coughing, or wheezing. Plaintiff reported that he was able to climb one flight of stairs. Dr. Bezdicek also examined plaintiff's abdomen and found it to be soft with no discernable abnormalities. As treatment, Dr. Bezdicek prescribed an inhaler and recommended that he stop smoking. Plaintiff declined this recommended course of treatment.

The ALJ noted that, with the exception of Dr. Tobias' observations and records, plaintiff reported no symptoms from the Hepatitis C besides mild fatigue. Medical

records indicate that plaintiff shows only mild pulmonary restriction and mild ventilatory defect as a result of his COPD. Plaintiff himself only complained of shortness of breath on exertion.

At step five, the ALJ asked the vocational expert ("VE") to consider an individual who "has the residual functioning capacity for a broad range of sedentary work, e.g., lifting/ carrying up to 10 pounds; sitting for 6 hours; standing and/or walking for two hours, with additional environmental restrictions that preclude him from no more than occasional exposure to dust, fumes, gasses, and other airborne irritants. . ." While the VE testified that such a hypothetical individual would not be able to return to his past work as a police officer, he would be able to perform other jobs that an individual with the same vocational characteristics and residual functioning capacity could perform. Specifically she testified that plaintiff could work as a fraud investigator, of which there are 15,000 jobs in the local economy and 250,000 in the national economy; and as an emergency dispatcher, of which there are 17,000 jobs in the local economy and 220,000 in the national economy. Based upon additional testimony from the VE, the ALJ found that said jobs exist in significant numbers in the national economy. The ALJ concluded, therefore, that plaintiff was not under a "disability" as defined in the SSA.

## V. ANALYSIS

### A. Credibility of Plaintiff's Subjective Complaints of Pain

The ALJ found that plaintiff's testimony as to his pain and functional limitation was not totally credible for several reasons. First, the ALJ noted that the claimant had only received conservative treatments for Hepatitis C and COPD, a level of treatment

inconsistent with plaintiff's allegations of disabling symptoms. Second, he observed plaintiff during the proceedings and noted no visible discomfort, distress, or shortness of breath. Third, the ALJ noted that plaintiff lacks a financial incentive to seek work as both he and his wife are receiving pensions for work as a NYC police officer and correction officer respectively. The ALJ also went on to contrast plaintiff's alleged disability with the medical evidence in the record. Plaintiff argues that the ALJ failed to explicitly and with sufficient specificity set forth his reasoning. Specifically, plaintiff contends that the ALJ's subjective assessment of his testimony is in direct conflict with the objective medical evidence.

It is within the ALJ's discretion to evaluate plaintiff's credibility "and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." Pardilla v. Apfel, No. 98 Civ. 5357, 2000 WL 145463, at *6 (S.D.N.Y. Feb. 9, 2000). However, "[i]f the ALJ decides to reject subjective testimony concerning pain and other symptoms, [he] must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether [his] determination is supported by substantial evidence." Lugo v. Apfel, 20 F. Supp.2d 662, 663 (S.D.N.Y. 1998) (quotation and citations omitted). In order to satisfy the substantial evidence requirement,

> the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments could reasonably be expected to produce the pain or other symptoms alleged. Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which

7

they limit the claimant's capacity to work.

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

Brodbeck v. Astrue, No. 5:05-CV-0257, 2008 WL 681905, at *19 (N.D.N.Y. Mar. 7, 2008) (*citing* 20 C.F.R. §§ 404.1529(a),(c), 416.929(a),(c)) (other citations and internal quotations omitted).

Here, the ALJ assessed the plaintiff's testimony in accordance with the guidelines set forth above. First, he found that the objective evidence alone did not substantiate the intensity, persistence, or limiting effects of the plaintiff's symptoms. The difference in symptoms plaintiff reported to Dr. Tobias and those he reported to Dr. Bezdicek and others required the ALJ to assess the credibility of the plaintiff's subjective complaints. In assessing plaintiff's credibility, the ALJ specifically addressed his conservative treatment for both COPD and Hepatitis C. He also addressed plaintiff's demeanor and carriage during the proceeding and how they conflicted with his allegations.[1] See Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998) (although such observations should be assigned only limited weight, an ALJ may take account of a plaintiff's physical demeanor in weighing

---

[1] The ALJ also cited the fact that both plaintiff and his wife were drawing government pensions. This Court does not find this fact persuasive or relevant in the context of this analysis.

the credibility of her testimony as to physical disability). It is apparent, therefore, that the ALJ had legitimate reasons for rejecting plaintiff's subjective testimony and his determination was supported by substantial evidence.

Accordingly, I conclude that plaintiff's contention regarding the ALJ's assessment of his credibility is without merit.

### B. Treating Physician Rule

At step four, the ALJ did not afford "any weight" to Dr. Tobias' opinion regarding plaintiff's limitations because 1) he was not a treating physician; and 2) "he merely related the claimant's symptoms, summarized the medical evidence before him, and arrived at a diagnosis." Plaintiff contends that the ALJ did not accord proper weight to Dr. Tobias' opinion.

It is well-settled that the ALJ must give controlling weight to the opinion of a treating physician if it is well-supported by the medical record and is not inconsistent with other substantial evidence. See Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

20 C.F.R. § 404.1502 defines a treating source physician as a physician who "provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." In contrast the applicable regulations define a "nontreating source" physician as a physician who "has examined you but does not have, or did not have an ongoing treatment relationship with you." Id; see also Schisler v. Bowen, 851 F.2d 43, 46 (2d Cir. 1988).

9

Here, the record shows that Dr. Tobias examined plaintiff only once, in April of 2004. Plaintiff was regularly treated by other physicians both before and after seeing Dr. Tobias. As such, the ALJ correctly did not view Dr. Tobias as a treating physician and therefore did not apply the treating physician rule. Because he is not a treating physician, his opinion is not controlling. See Smith v. Bowen, 687 F. Supp. 902, 905 (S.D.N.Y. 1988). The ALJ went on to correctly point out that even if Dr. Tobias were a treating physician, his opinion that plaintiff is disabled is a legal opinion reserved for the Commissioner and is therefore not entitled to controlling weight. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Beyond this legal conclusion, Dr. Tobias' recommendation did little more than state the result of lab work without detailing how conditions, such as "elevated plasma ammonia," affect plaintiffs ability to work. The one exception is his finding that plaintiff complains of fatigue and systematic weakness which "prevent him from carrying out routine physical activities of daily living."

However, the ALJ did take Dr. Tobias' medical opinion into account, as he was required to do by law, stating that "[w]hile these opinions cannot be ignored, they must be considered and given appropriate weight to the extent that they are supported by objective clinical findings and other substantial evidence of record." See 20 C.F.R. § 404.1527(d). In evaluating Dr. Tobias' non-controlling opinion, the ALJ considered the medical opinions of actual treating physicians who treated plaintiff both before and after Dr. Tobias, and the subjective testimony of the plaintiff. The ALJ found that the record "does not contain any opinions from any of the plaintiff's treating physicians that he has any current restrictions, which

10

would be expected given the claimant's allegations of totally disabling symptoms." As such, the Court finds that the ALJ gave the medical opinion of Dr. Tobias sufficient weight and correctly relied on the findings of treating physicians who examined plaintiff both before and after Dr. Tobias.

Accordingly, I conclude that plaintiff's contention regarding the ALJ's assessment of Dr. Tobias' opinion is without merit.

### C. Residual Functional Capacity Assessment

Plaintiff further argues that the ALJ failed to properly evaluate plaintiff's residual functional capacity ("RFC"). In assessing RFC,

> the ALJ must make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch, based on medical reports from acceptable medical sources that include the sources' opinions as to the claimant's ability to perform each activity. 20 C.F.R. § 404.1513(c)(1). Only after that analysis is completed, may RFC be expressed in terms of the exertional levels of work[:] sedentary, light, medium, heavy, and very heavy.

Brodbeck, 2008 WL 681905, at *7 (citation omitted). See S.S.R. 96-8p, 1996 WL 374184, at *1. Further,

> [t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing bases (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

S.S.R. 96-8p, 1996 WL 374184, at *7.

11

Here, at step four, the ALJ's discussion regarding plaintiff's exertional limitations is as follows:

> Giving great deference to Dr. Bezdicek's diagnosis of COPD with mild restrictive lung disease and mild ventilatory defect (Exhibit 7F) and based on an overall assessment of the entire record, the undersigned finds that the claimant retains the residual capacity to lift/cary objects weighing up to 10 pounds; sit for up to six hours and stand/walk for two hours in an average 8-hour workday, with additional restrictions to avoid more than occasional exposure to dust, fumes, gasses, and other airborne irritants. From an exertional standpoint, this assessment is consistent with the state agency's residual functional capacity assessment dated May 27, 2004 that the claimant can perform the physical demands of sedentary work, which the undersigned finds persuasive. (Exhibit 6F).

The ALJ referenced both the findings of treating physician Dr. Bezdicek as well as the non-examining assessment in the residual functional capacity assessment. Said findings constitute the required function-by function determination of plaintiff's RFC. Accordingly, I conclude that plaintiff's contention regarding the residual functional capacity assessment is without merit.

### D. Vocational Expert's Hypothetical at Step Five

Plaintiff also contends that, although the vocational expert testified that jobs existed in the national and regional economy that plaintiff could perform, the expert's opinion was based upon hypotheticals which failed to reflect all of plaintiff's impairments and limitations. Plaintiff also claims that he did not receive a full and fair hearing as the VE did not hear his testimony before answering the hypothetical.

> When the testimony of a vocational expert is utilized, as here, the ALJ must present a hypothetical that incorporates all of [p]laintiff's impairments. If the ALJ fails to pose hypothetical questions that include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability.

Brodbeck, 2008 WL 681905, at *18 (internal quotations and citations omitted).

Here, the ALJ's decision states that he asked the vocational expert

> to consider an individual who has the residual functional capacity for a broad range of sedentary work, e.g. lifting/carrying up to 10 pounds, sitting for 6 hours; standing and/or walking for two hours, with additional environmental restrictions that preclude him from no more than occasional exposure to dust, fumes, gasses, and other airborne irritants. . .

This hypothetical effectively assumes the evidence as ultimately found. As such, the VE's response constitutes substantial evidence to support a conclusion of no disability. The VE's testimony was based entirely on the hypothetical proposed by the ALJ. In the course of posing the hypothetical, the ALJ relayed all pertinent vocational information. As such, the fact that the VE did not actually hear plaintiff's testimony is of no moment. Accordingly, I conclude that plaintiff's contention regarding the ALJ's hypothetical is without merit.

### E. Commissioner's Burden of Proving Plaintiff's Transferable Skills

During the course of the administrative proceeding, the ALJ relied on the testimony of a VE to find that the plaintiff has skilled work experience and skills that can be transferred to other jobs within his residual functional capacity. The VE cited the following applicable skills: the ability to communicate with others, knowledge and experience of routines of a complex investigation, ability to compute and develop reports, and investigative skills. Plaintiff argues that the transferable skills cited by the ALJ are nothing more than abilities or aptitudes.

The Second Circuit examined, in detail, the difference between transferable skills

and mere traits and aptitudes that are not linked to any particular tasks in <u>Draegert v. Comm'r of Social Security</u>, 311 F.3d 468 (2d. Cir 2002). The Second Circuit, citing Social Security ruling 82-41 defines "skill" as "knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through the performance of an occupation which is above the unskilled level (requires more than 30 days to learn)." <u>Id.</u> at 471. To put it another way, a skill is a learned ability, while an attribute is an innate ability. Specifically, the Second Circuit found that the abilities to: (1) learn and apply rules and procedures which are sometimes hard to understand; (2) use reason and judgment in dealing with all kinds of people; (3) think clearly and react quickly in an emergency; (4) keep physically fit; and (5) make conclusions based on facts and on one's personal judgment are only abilities and attributes. <u>Id.</u> at 476. For attributes to be relevant to this analysis, they must have been used in connection with a work activity. <u>Id.</u>

In the instant case, the <u>Draegert</u> court's rationale is certainly applicable to the "skill" of communication. Communication is certainly an ability or attribute as it is "too vague to constitute a particular skill which is transferable." <u>Id.</u> at 475. As the vocational expert made no attempt to connect the attributes to specific work activities, it is not relevant to this analysis.

The final two alleged transferable skills cited by the vocational expert, however, are not innate attributes, but rather skills learned by plaintiff in the course of his job as a police officer. As they are specific skills transferable to the jobs of fraud investigator and emergency dispatcher, they are relevant to this analysis. Because they are not vague attributes, they do not require the additional clarification of connection to a

14

specific work activity.  Id.  Accordingly, I conclude that plaintiff's contention regarding the Commissioner's burden of proving plaintiff's transferable skills is without merit.

F. Commissioner's Burden of Demonstrating that a Significant Number of Jobs that Mr. Gittens Could Perform Exist in the National or Local Economy

As part of the step five analysis, the Commissioner has the burden of establishing that jobs that Mr. Gittens could perform exist in the national or local economy.  Barnhart v. Thomas, 540 U.S. 20, 25 (2003).  In establishing this element, the ALJ relied on the testimony of the VE.  After testifying that plaintiff was capable of making a vocational adjustment, she testified that there are 15,000 jobs in the local economy and 250,000 jobs nationwide for fraud investigators; and that there are 17,000 jobs locally and 220,000 jobs nationwide for emergency dispatchers.  When questioned about the source of the statistics, the VE cited to the "Employment Statistics Quarterly Report."  Plaintiff claims that no such publication exists.  In defendant's cross motion memorandum, he suggests that the publication referred to by the VE was actually the "Quarterly Census of Employment and Wages."  In his reply, plaintiff points out that the information provided by the VE to the ALJ at the administrative proceeding is not contained in this alternate publication suggested by defendants.  In response, defendants agree that the Quarterly Census of Employment and Wages does not contain the proffered information.

Plaintiff cites McKinnie v. Barnhart, 368 F.3d 907 (7th Cir. 2004) for the proposition that the ALJ should not have accepted vocational expert testimony that a significant number of jobs existed without first inquiring into the reliability of the experts

15

opinions. The defendant cites authority from the Ninth Circuit, <u>Bayless v. Barnhardt</u>, 427 F.3d 1211 (9th Cir. 2005), for the proposition that a vocational expert's recognized expertise provides the necessary foundation for his or her testimony and that no additional foundation is required.

In the present case, however, the question is not whether the ALJ was required to established a foundation by questioning the VE on his testimony. The record shows that the VE was in fact questioned as to the source of his numbers, to which she answered "they're from the Employment Statistics Quarterly Report, and it's broken down by region. I received that quarterly. It's through the department of Labor." (Tr. 288). Defendant cannot refute plaintiff's allegation that such a publication does not exist.

It is the Commissioner's burden to establish that there is other gainful work in the national economy which the plaintiff is able to perform. <u>Tejada v. Apfel</u>, 167 F.3d 770, 774 (2d Cir. 1999). The factual findings of the Commissioner are conclusive if they are supported by substantial evidence. <u>See</u> 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quotation and citation omitted). As the record now stands, the Commissioner met his step five burden by relying on a non-existent report. The fact that the unsubstantiated report was presented to the ALJ by a VE does not change this fact. Accordingly, I conclude that the matter must be remanded for further administrative proceedings.

## VI. CONCLUSION

For all of the foregoing reasons, I conclude that plaintiff's motion for judgment on the pleadings should be granted to the extent it seeks remand to the Commissioner for further proceedings in accordance with this Decision and Order, and the Commissioner's cross-motion should be denied.

The Clerk of the Court shall enter judgment accordingly.

Dated: June 20th, 2008
White Plains, New York

SO ORDERED:

_____
GEORGE A. YANTHIS, U.S.M.J.